The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner John A. Hedrick and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence or to amend the Opinion and Award except for the correction of plaintiff's average weekly wage and compensation rate in Conclusion of Law (2) and Award Paragraph (1).
* * * * * * * * * * *
EVIDENTIARY RULINGS
The objections appearing in the deposition of Dr. Morowitz, Dr. de Perczel and Dr. Naso are OVERRULED.
* * * * * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing before Deputy Commissioner Hedrick as:
STIPULATIONS
1. On the date of plaintiff's alleged injury, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. From 21 March 1989 through the date of the hearing before Deputy Commissioner Hedrick, an employment relationship existed between plaintiff and defendant.
3. Plaintiff's average weekly wage was $410.79, which yields a compensation rate of $273.87.
4. Plaintiff was unable to work from 29 September 1994 until 9 March 1995, at which time plaintiff returned to work with the exception of one week during January 1995 when plaintiff unsuccessfully attempted to return to work.
5. Plaintiff returned to work for defendant on 9 March 1995.
6. A video tape depicting the duties of a creeler and a ball warper tender, marked as Stipulated Exhibit Number Two, is admitted into evidence.
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner, and finds as follows:
FINDINGS OF FACT
1. At the time of the hearing, plaintiff was thirty years old, married and the mother of two children. Plaintiff graduated from high school. Plaintiff began her employment with defendant in March 1989. Her only prior employment was with K-Mart when she was seventeen years old.
2. When she began her employment with defendant in 1989, plaintiff worked as a material handler, supplying boxes of yarn to the spoolers. Beginning 26 May 1989, plaintiff began working as a creeler. Plaintiff worked as a creeler through 24 March 1990 when she began working as a ball warper tender trainee. Plaintiff worked in the trainee position until 1 October 1990, when she was promoted to ball warper tender. Plaintiff was employed as a ball warper tender through the date of the hearing.
3. The duties of a creeler were to remove empty cones from the creel, place the cones on a pin truck, and move them to a designated area. The creeler moved full packages from a holding area, inspected each package, and replaced empty cones with new packages as needed. When placing a new package on a pin, the creeler tied the tail of the new package to the front of the next package using a hand knotter. The creeler positioned the tails at 3 o'clock and 9 o'clock. Each new package weighed approximately eight and one-half pounds. Plaintiff creeled between seventy-five and eighty-three new packages each hour. Some packages were placed on pins that required plaintiff to reach overhead.
4. The duties of a ball warper tender were to thread-up and lay-in ends in preparation for operation of the machinery. The tender was responsible for inserting leases at the appropriate intervals. Leases were inserted sixteen times for each ball warp, including tie-on and tie-off leases. The tender operated the warper and insured proper transfer of yarn from the packages to the logs. The tender was also responsible for tying-in and re-threading broken warp ends, preparing the ball warp for doffing and using an air hose to blow off the warper and creeler twice per shift. Plaintiff used the air hose to blow cotton dust off of each eyelet on both sides of the creel. The tender also filled out tickets and a warper book regarding yarn breaks. The tender was expected to run an average of ten ball warps per shift.
5. Plaintiff was also responsible for performing creeler duties while working as a warper tender. These duties were to cut out "no-tails", packages of yarn that had no tails and could not be creeled throughout the creel. These packages were run at the front of the creel and had to be creeled after running every third ball warp. Plaintiff was not required to place the new packages onto the pegs. Her responsibility was to use scissors to cut the end from an old spool and then tie the end from the new package to the running package.
6. In both the creeler and ball warper tender positions, plaintiff worked twelve hour shifts, alternating between three and four days per week every other week.
7. To perform her duties as a creeler, plaintiff made repetitive hand, arm and wrist movements. Although plaintiff's work as a creeler allowed her to take periodic breaks from her work, when removing empty spools, placing full packages on the pegs and tying and positioning ends, plaintiff's hands, wrists and arms were in continuous motion.
8. Plaintiff also moved her hands, wrists and arms as a ball warper tender. The movements she made while tending the ball warper were not continuous and were not as strenuous as the movements she made as a creeler. Plaintiff did make repetitive hand, wrist and arm movements while working as a warper when she cut out "no-tails" at the end of the creeler.
9. On 5 May 1989, plaintiff presented to Carolyn Summey, defendant's nurse, complaining of pain in her right wrist, arm and middle finger. On 3 August 1989, plaintiff complained to Ms. Summey of tingling in her extremities. On 5 November 1990, Ms. Summey provided plaintiff with braces for both wrists. Thereafter, plaintiff frequently presented to Ms. Summey for hand and wrist pain. Ms. Summey regularly soaked plaintiff's hands and lower arms in ice water. She also applied Myoflex and massaged plaintiff's arms.
10. Plaintiff continued working for defendant as a warper tender, wearing the braces provided by Ms. Summey, through April 1994 when she presented to Dr. Hamrick. Plaintiff also wore a different set of wrist braces at home in an effort to relieve wrist pain that disrupted her sleep.
11. On 17 May 1994, plaintiff presented to Dr. Naso complaining of bilateral wrist pain. Dr. Naso recommended splinting, job modification, warm compresses and stretching. On 25 August 1994, plaintiff presented to Dr. de Perczel of pain, numbness and tingling in her hands. Dr. de Perczel prescribed anti-inflammatory medication and night braces.
12. Plaintiff's hand and wrist pain resulted from bilateral carpal tunnel syndrome. Thereafter, plaintiff underwent left and right carpal tunnel releases performed by Dr. de Perczel. Following her surgeries, plaintiff's hand numbness diminished, however, her pain persisted.
13. As a result of her carpal tunnel syndrome, plaintiff was unable to earn wages from defendant or any other employer from 29 September through 8 March 1995. Plaintiff unsuccessfully attempted to return to work for defendant for one week in January 1995. On 9 March 1995, plaintiff returned to work for defendant as a warper. Upon returning to work, plaintiff was restricted to working six hours per shift.
14. As a result of her carpal tunnel syndrome, plaintiff's earning capacity was diminished by $205.40 per week from 9 March 1995 and continuing through the present.
15. Plaintiff's carpal tunnel syndrome was caused by her employment as a creeler and as a ball warper tender. As a creeler and a ball warper tender, plaintiff was at an increased risk of developing carpal tunnel syndrome as opposed to members of the general public not so employed.
* * * * * * * * * * *
Based on the foregoing findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. Plaintiff's bilateral carpal tunnel syndrome is due to causes and conditions characteristic of and peculiar to her employment with defendant, is not an ordinary disease of life to which the general public not so employed is equally exposed and is, therefore, an occupational disease. N.C. Gen. Stat. § 97-53(13); Rutledge v.Tultex Corp., 308 N.C. 85 (1983).
2. As a result of her occupational disease, plaintiff is entitled to payment of temporary total disability compensation at the rate of $273.87 per week from 29 September 1994 through 8 March 1995. N.C. Gen. Stat. § 97-29.
3. As a result of her occupational disease, plaintiff is entitled to payment of temporary partial disability compensation at the rate of $136.94 from 9 March 1995 and continuing for three hundred weeks from 29 September 1994 or until order of the Industrial Commission allowing defendant to cease payment of temporary partial disability compensation. N.C. Gen. Stat. §97-30.
4. Plaintiff is entitled to payment of all medical expenses incurred as a result of her occupational disease. N.C. Gen. Stat. § 97-25.
5. Defendant is entitled to a credit against the compensation due to plaintiff equal to the wages she earned during her attempt to return to work in January 1995.
* * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission Modifies and Affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Defendant shall pay plaintiff temporary total disability compensation at the rate of $273.87 per week from 29 September 1994 through 8 March 1995. This amount shall be paid in a lump sum, subject to the credit due defendant in paragraph 4 and the attorney's fee approved in paragraph 5.
2. Defendant shall pay plaintiff temporary partial disability compensation at the rate of $136.94 from 9 March 1995 and continuing for three hundred weeks from 29 September 1994 or until order of the Industrial Commission allowing defendant to cease payment of temporary partial disability compensation. To the extent that this amount has accrued, it shall be paid in a lump sum, subject to the credit due defendant in paragraph 4 and the attorney's fee approved in paragraph 5.
3. Defendant shall pay all medical expenses incurred by plaintiff as a result of her occupational disease.
4. Defendant shall receive a credit against the compensation due to plaintiff equal to the wages she earned during her attempt to return to work in January 1995.
5. A reasonable attorney's fee of twenty-five percent of the compensation due plaintiff in paragraphs 1 and 2 of this Award is approved for plaintiff's attorney and shall be paid as follows: twenty-five percent of the lump sum due plaintiff shall be deducted from that amount and paid directly to plaintiff's attorney. Thereafter, plaintiff's attorney shall receive every fourth compensation check due plaintiff.
6. Defendants shall pay the costs, including $235.00 to Dr. de Perczel as an expert witness fee.
 S/ ___________________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ ______________________ COY M. VANCE COMMISSIONER
S/ ______________________ DIANNE C. SELLERS COMMISSIONER